1 | RIMÔN, P.C.
Ivan L. Tjoe (SBN 203420)
2 | ivan.tjoe@rimonlaw.com
2029 Century Park East, Suite 400N
3 | Los Angeles, California 90067
Telephone: (213) 314-2938
4 | Mobile: (213) 447-2424

5 | RIMÔN, P.C
Jonathan N. Rosen (SBN 162607)
6 | jonathan.rosen@rimonlaw.com
1717 K Street NW, Suite 900
7 | Washington, D.C. 20006
Telephone: (202) 400-3846

8 |

9 | Attorneys for Plaintiffs

10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

13 |

14 | MARK DIAS, an Individual;
SHANGHAI YONGHUA CAPITAL
15 | INVESTMENT MANAGEMENT CO.
LTD., a Chinese entity; SUZHOU
16 | QUANTONG MEDICAL TECH. CO.,
LTD., a Chinese entity; POWERFUL
17 | ANCHOR (CAYMAN) LIMITED, a
Cayman Islands LLC; and YONGYUN
18 | (CAYMAN) LIMITED, a Cayman
Islands LLC,
19 |
                Plaintiffs,
20 |     v.
21 | SPARTAN MICRO, INC., a Wyoming
corporation; ERIC STOPPENHAGEN,
22 | an Individual; THOMAS GARDNER,
an Individual and DOES 1 Through 35,
23 | inclusive,
24 |              Defendants,
25 |

Case No.

**COMPLAINT AND JURY
DEMAND FOR:**

1. **SECURITIES FRAUD (RULE
   10b-5)**
2. **BREACH OF FIDUCIARY
   DUTY;**
3. **BREACH OF WRITTEN
   AGREEMENTS;**
4. **BREACH OF THE IMPLIED
   COVENANT;**
5. **UNJUST ENRICHMENT;**
6. **DECLARATORY RELIEF;
   AND**
7. **FRAUD**

26 |

27 |

28 |

## COMPLAINT

1.   Plaintiffs MARK DIAS ("Dias"); SHANGHAI YONGHUA CAPITAL INVESTMENT MANAGEMENT CO. LTD.; SUZHOU QUANTONG MEDICAL TECHNOLOGY CO., LTD.; POWERFUL ANCHOR (CAYMAN) LIMITED; and YONGYUN (CAYMAN) LIMITED (collectively the "Plaintiffs") by and through their attorneys, Ivan L. Tjoe and Jonathan N. Rosen, hereby file their Complaint against SPARTAN MICRO, INC., ERIC STOPPENHAGEN, and TOM GARDNER (collectively the "Defendants") as follows:

## INTRODUCTION

2.   Spartan Micro Inc. and its CEO, Eric Stoppenhagen, fraudulently induced the parties described herein to purchase the stock of Spartan pursuant to the Stock Purchase Agreement (hereinafter the "SPA") in 2020.  At the time of the SPA, Stoppenhagen had so severely mismanaged Spartan's finances, defendants were desperate for cash just to maintain Spartan's continued operations.  To safeguard Spartan's existence, Stoppenhagen withheld material facts about Spartan's dire financial condition from the Plaintiffs and made false statements or misrepresentations of material facts about Spartan's regulatory compliance to the Plaintiffs during the period prior to the closing of SPA.  After Spartan received the final investment of monies pursuant to the SPA, Stoppenhagen attempted to hijack control of Spartan and Plaintiffs' investment in Spartan under the SPA, for his personal gain by violating *inter alia* the SPA and Spartan's Amended Articles of Incorporation.  In response, Stoppenhagen was terminated as Spartan's CEO by its board of directors.  In retaliation, Stoppenhagen stormed into Spartan's office, seized control of Spartan's assets and in a bizarre attempt to physically take the company back from the Plaintiffs, loaded Spartan's property in the back of a vehicle, thereby leaving Spartan's base of operations destitute and without sufficient resources to conduct its business.

## JURISDICTION AND VENUE

3.  Plaintiffs assert claims under the Securities and Exchange Act of 1934 and various laws of the state of California.  This Court has original jurisdiction over this action and to the [securities fraud counts] for relief by virtue of Title 15, United States Code Section 77v(a) [Section 11(a) of the Securities Act], on account of the federal securities claim, and by virtue of Title 15, United States Code Sections 78u(d)(3)(A), 78u(e), and 7811; and Title 28, United Stats Code Section 1331, and under federal question jurisdiction Title 28, United States Code Section 1367(a).  In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, airline travel across state lines, and the wires (including e-mails and the wiring of funds in the banking system and telephone communications).

4.  This Court also possesses diversity jurisdiction of this action pursuant to 28 U.S.C. § 1332, in there is complete diversity of citizenship between the parties, and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of pre-judgment interest, post-judgment interest and costs.

5.  Venue is proper in the Central District of California pursuant to Section 22 of the Securities Act, Title 15, United States Code Section 77v; and Section 27 of the Exchange Act, Title 15, United States Code Section 77a, because Orange County in the Central District of California is the county in which the certain events alleged herein constituting violations of the law took place and because Plaintiffs are informed and believe and on that basis that Spartan's principal place of business is in Orange County, California; Stoppenhagen resides in Newport Beach, California; and Gardner resides in Laguna Nigel, California.

## PARTIES

6.  Mark Dias (hereinafter "Dias") is an individual who is a resident of and domiciled in Reno, Nevada.

7.   Shanghai Yonghua Capital Investment Management Co. LTD (hereinafter "Yonghua") is a limited liability company that was formed and operates under the laws of The People's Republic of China.  Its principal place of business is located in China.

8.   Suzhou Quantong Medical Technology Co., LTD (hereinafter "MedTech") is a limited liability company that was formed and operates under the laws of The People's Republic of China.  Its principal place of business is located in China.

9.   Powerful Anchor (Cayman) limited (hereinafter "Powerful") is a limited liability company that was formed and operates under the laws of Cayman Islands. Its principal place of business is located in Singapore.

10.  Yongyun (Cayman) Limited (hereinafter "Yongyun") is a limited liability company that was formed and operated under the laws of Cayman Islands.  Its principal place of business is located in China.  (Yonghua, MedTech, Powerful and Yongyun are hereinafter collectively referred to as the "**Investing Entities**".)

11.  Defendant Spartan Micro Inc. (hereinafter "Spartan" or the "Corporation") is a corporation organized under the laws of the State of Wyoming with its principal place of business located in Costa Mesa, California.

12.  Defendant Eric Stoppenhagen (hereinafter "Stoppenhagen") is a resident of and domiciled in Newport Beach, California.

13.  Defendant Tom Gardner (hereinafter "Gardner") is a resident of and domiciled in Laguna Nigel, California.  (Spartan, Stoppenhagen, and Gardner are collectively referred to as "**Defendants**".)

## FACTUAL ALLEGATIONS

14.  Plaintiff Dias and defendant Stoppenhagen founded Spartan in 2016 as a Wyoming corporation.

15.  Stoppenhagen holds a U.S. law degree and MBA.  Upon information and belief and at all pertinent times hereto, Stoppenhagen was the drafter of the corporate documents discussed in the now dismissed matter of *Spartan Micro, Inc.*

*v. Dias, et. al.* (USDC C.D. CAL case 8:21-CV-01630-JVS-KES) and in this complaint.

16. Spartan is engaged in the research, design, and development of neurovascular medical devices to treat hemorrhagic stroke (brain aneurysms) including neuro and peripheral vascular stents and flow diversion devices.  Spartan designed its products for use by specialist physicians to treat common and uncommon cerebrovascular diseases and abnormalities.

17. In or about 2018, Stoppenhagen was introduced to Yonghua through an acquittance of Chong Wang ("Wang") – Dr. Lei Feng.  In or about early 2019, after having obtained information relating to Spartan's devices, the Investing Entities expressed interest in investing in Spartan.  At the time, the Investing Entities were interested in creating a new joint venture, MedTech, to develop and then sell Spartan's products in Asia.

18. The parties engaged in off and on discussions from or about early 2019 to August 2020 culminating into the entry of the SPA where the Investing Entities agreed to invest no less than $5 million in Spartan.

19. Stoppenhagen fraudulently induced the Investing Entities to enter into the SPA and/or invest these monies through the material misrepresentations and omissions of the material facts described herein.

20. On or about November 16, 2020, Spartan received the final investment of monies pursuant to the SPA.  Shortly thereafter on or about December 2020, Stoppenhagen completed the first steps to wrest control of Spartan by improperly terminating Spartan's Chief Technology Officer ("CTO") and the inventor of Spartan's core intellectual property – Dias - to commandeer control of Spartan for his personal gain.

21. From 2016 through 2018, Spartan had zero sales and no commercially ready products.  As a development stage company, Spartan was struggling to make it out of the "valley of death"— or the period between the initial investment and creation

of a commercially-viable product.  To remain viable, Spartan required significant capital from investors to maintain its ability to develop and manufacture products for market.

22. As a result, Spartan's flagship "Spartan eCoil System" ("*eCoil* System") was critical to Spartan's fundraising business strategy.  In 2016,  Mr. Dias successfully designed and developed the patent disclosures for the *eCoil* System, which represented an improved method for the delivery and detachment of embolic devices which are used for treating hemorrhagic stroke (brain aneurysms) that make up 60% of the overall neurovascular device market.  The US market size of stroke treatment products is estimated around $1.5 - 2.0 billion USD annually.

23. Dias introduced Stoppenhagen to prominent neurosurgeons in Los Angeles and elsewhere to jointly demonstrate the possible applications of the *eCoil* System. The feedback from these meetings were very favorable.

24. Between 2017-18, Mr. Dias worked to obtain third party certification ("ISO 13485 certification") of Spartan's safety and quality management system ("QMS"), which aligned Spartan with the quality system regulations of the United States Food and Drug Administration ("FDA").  Spartan's ISO 13485 certification required, among other things, that Spartan's R&D activities be approved and supervised by Dias and take place at its Fremont, California facility, where Dias and another engineer had built the equipment used in Spartan's R&D activities.  The ISO 13485 certification limited Spartan's R&D to Fremont because it housed the most critical equipment of the company which required daily, weekly, monthly, and quarterly monitoring by internal personnel and an outside vendor and was the location where all physical records were stored.

25. Thereafter, Mr. Dias performed exhaustive due diligence to complete a premarket submission and provide necessary supplemental information to the FDA for clearance to sell the *eCoil* System in the United States.  By the end of December 2018, Spartan received 510k clearance from the FDA to market the *eCoil* System,

subject to numerous regulatory requirements, which, among other things, required Spartan to follow stringent design, testing, control, documentation, and other quality assurance procedures during all aspects of the manufacturing process ("QSR").

**(STOPPENHANGEN'S MATERIAL MISREPRESENTATIONS AND OMMISSIONS OF MATERIAL FACT)**

26. After Spartan received FDA clearance for its *eCoil* System, the Investing Entities began negotiating with Spartan. Stoppenhagen exclusively negotiated with the Investing Entities on behalf of Spartan.

27. During the negotiations, Stoppenhagen had so severely mismanaged Spartan's finances that he was forced layoff Spartan's manufacturing workforce including its Chief Technology Officer ("CTO") – Dias. To safeguard Spartan's existence, Stoppenhagen withheld this material fact from the Investing Entities and made other false statements or material omissions to the Investing Entities prior to the close of the SPA. The Investing Entities were unaware of Stoppenhagen's malfeasance.

28. Prior to the execution of the SPA, Mr. Wang inquired extensively on behalf of the Investing Entities about Spartan's business strategy including Spartan's continued reliance on Dias as CTO for his expertise in the neurovascular space and its ability to scale up its capacity to manufacture the *eCoil* System for sale and for the continued development of other devices in its portfolio.

29. The Investing Entities became aware prior to agreeing to the SPA that Stoppenhagen is listed as the or co-inventor to all of Spartan's patent disclosures despite the fact he did not possess either a technical background or experience to have been able to be the true inventor. The Investing Entities surmised prior to the close of the SPA that Dias was in fact the true inventor to all of Spartan's patent disclosures.

30. Mr. Dias is a scientist who received his Bachelor of Science in Mechanical Engineering from San Jose State University and is an expert in developing neurovascular products for commercial use. The Investing Entities learned from

Dias after the close of the SPA that he exclusively authored all the patent disclosures for all intellectual property relevant to the *eCoil* System. He assigned them to Spartan to acquire fifty percent (50%) equity interest in the company on or about 2016.

31. Mr. Wang repeatedly communicated to Stoppenhagen as to the significance to the Investing Entities of Dias's continuing contributions to not only be able to the manufacture of the *eCoil System* in scale but the continued development of other products in Spartan's portfolio to their decision to invest in Spartan and to the creation of MedTech.

32. In addition to being the inventor of Spartan's core intellectual property, Mr. Dias was also responsible for supervising Spartan's team of engineers, Quality and Regulatory Specialists, all of whom were based in Spartan's office in Fremont.

33. The Investing Entities are informed and believe and on that basis allege that their stated requirement Dias remain as Spartan's CTO created doubts within Stoppenhagen as to his importance to the Investing Entities post close of the SPA. Investing Entities are informed and believe and on that basis allege that although Stoppenhagen personally needed the Investing Entities to invest in Spartan to salvage his personal investments and equity in the Corporation, he must have realized Dias's relative importance to the proposed joint venture and therefore was prepared to undermine and discredit Dias if necessary.

34. During the time Stoppenhagen was negotiating with the Investing Entities, Spartan ran out of money. Despite realizing incipient sales from the *eCoil* System's pilot run in 2019, Stoppenhagen burned through most of Spartan's cash on: (a) his American Express card charges which were allocated to various corporate expense categories, (b) rent for an unnecessary second Spartan office in Tustin, California (the "Tustin Office") near Stoppenhagen's Newport Beach home; and (c) the purchase of ownership interests in three entities – Anchor Endovascular, Inc. ("Anchor"), Python Vascular, LLC ("Python") and ICAD LLC ("ICAD")

(collectively the "*early stage projects*") that did not contribute or add value to Spartan's *eCoil* System.  The *early stage projects* held by Anchor, Python and ICAD respectively each had failed to receive regulatory approval and therefore required a substantial dedication of capital and employee time to make the *early stage projects* commercially viable.

35. To staunch the bleeding at Spartan caused in part to service the *early stage projects*, Stoppenhagen laid off approximately four (4) employees in Spartan's manufacturing workforce in or around the middle of 2019.  In Q4, 2019, he fired the balance of Spartan's employees at the Fremont facility including Dias but continued to operate the Tustin Office for continued work on the *early stage projects*.

36. The fired Spartan employees included a number of individuals who provided critical support to Spartan's manufacturing capabilities.  These individuals included *inter alia* Thu Pham, Rajendra Patel, Bharat Patel, Linh Van, and Cindy Du (collectively the "critical employees") as well as Dias and Ricardo Afan.

37. After Stoppenhagen shut down the Fremont facility, and while he was negotiating for the expected infusion of capital from the Investing Entities, Stoppenhagen retreated to Spartan's Tustin Office, where he continued R&D activities for the development of the *early stage projects*.  Stoppenhagen continued development of the *early stage projects* (e.g., micro catheters and aspirational catheters) because he represented to the Investing Entities these medical devices would be approved for and ready to transfer to the joint venture expeditiously after the close of the SPA.  Spartan's R&D work at the Tustin Office were, however, not ISO compliant because Stoppenhagen, not Dias, was overseeing the testing, which was done outside of Spartan's documentation requirements set out in the certified QMS managed by Dias and as directed by the ISO 13485 requirements.

38. R&D activities not supervised by Dias jeopardizes the Investing Entities' investment in Spartan by subjecting Spartan to liability should any of its medical devices injure a patient.  Further, activities that do not adhere to the design controls

in the QMS developed by Dias could cause Spartan to lose its ISO 13485 certification which could irreparably harm Spartan's ability to bring its products to market.

39. Despite Stoppenhagen's shut down of the Fremont facility, termination of the critical employees and dedication of R&D outside the scope of Spartan's ISO compliance, Stoppenhagen did not amend Spartan's Private Placement Memorandum dated December 2018 ("PPM"), on which the Investing Entities relied during their negotiations with Stoppenhagen.  In pertinent part, the PPM stated, among other things.

> We believe our ability to rapidly develop innovative products will rely on our integrated product innovation process and our management's desire to adhere to this philosophy.  In addition, we are recruiting engineers with both significant experience in the development of medical devices as well as engineers directly from undergraduate and graduate programs that have become immediately productive within our development process.  We have a pipeline of products in various stages of development that are expected to provide additional commercial opportunities.
>
> Manufacturing
>
> We currently maintain two manufacturing facilities:
>
> 1. 3,600 SqFt R&D and manufacturing facilities in Fremont, CA. 500 SqFt clean room.
>
> 2. 4,500 SqFT R&D and manufacturing facilities in Tustin, CA. 300 SqFt clean room.
>
> We have instituted rigorous quality control management programs in order to be EN ISO 13485 complaint with ISO 13485 certification. In 2019, we plan to achieve compliance with MDD standards, allowing our products to be CE marked.  We will issue annual internal audits,

combined with external audits by regulatory agencies to help ensure strong quality control practices for the absolute achievement of patient safety.  An internal, on-going staff training and education program contributes to our quality assurance program training is documented and considered part of the employee evaluation process.

EMPLOYEES

. . . we have never experienced a work stoppage. We believe our employee relations are good.

40. Stoppenhagen never advised to the Investing Entities that he had to shutter the Fremont facility or that he had to layoff Spartan's critical employees, including Dias, prior to execution of the SPA.  Although Dias were re-retained after the parties' execution of the SPA, Spartan was unable to re-retain the expertise of the critical employees.

41. Stoppenhagen also did not advise the Investing Entities that when the Fremont Facility was shuttered, he directed R&D at the Tustin Office that were not ISO compliant and outside of Spartan's QMS.  These R&D activities places Spartan in jeopardy of losing its ISO13485 Certification as well as its California FDB License.  If either occurs this will cause extensive delays in Spartan's ability to bring its products to market.

42. To the contrary, Stoppenhagen executed the SPA representing to the Investing Entities *inter alia*:

2.24 <u>Preclinical Development and Clinical Trials</u>.  The studies, tests, preclinical development and clinical trials, if any, conducted by or on behalf of the Company are being conducted in all material respects in accordance with experimental protocols, procedures and controls pursuant to accepted professional and scientific standards for products or product candidates comparable to those being developed by the Company and all applicable laws and regulations,

including the Federal Food, Drug, and Cosmetic Act and 21 C.F.R. parts 50, 54, 56, 58, 312, and 812. The descriptions of, protocols for, and data and other results of, the studies, tests, development and trials conducted by or on behalf of the Company that have been furnished or made available to the Purchasers are accurate and complete. . .

43.  Plaintiffs are informed and believe and on that basis contend that Stoppenhagen always intended, and even before entry into the SPA, to commandeer control of Spartan, its assets and the funds the Investing Entities would and ultimately did invest in Spartan for his sole use and benefit.

44.  On or about August 11, 2020, the Investing Entities became shareholders of Spartan after executing and performing their obligations under the SPA, resulting in their receipt of 1,996,805 shares of Series A-2 Preferred Stock.  Stoppenhagen signed the SPA on behalf of Spartan.

45.  Pursuant to its *Articles of Incorporation*, Spartan originally issued 50,000,000 shares of common stock.  No preferred stock, however, was created at the time Spartan filed its *Articles of Incorporation*.

46.  As a condition to investing in Spartan, the Investing Entities required Spartan to amend its Articles of Incorporation, *inter alia* to: (1) to create and issue Series **A-1** Preferred Shares of Stock; (2) to create and issue series **A-2** Preferred Shares of Stock to Yonghua and its affiliates; and (3) to amend Spartan's Articles of Incorporation so that Investing Entities could appoint two (2) of Spartan's permitted three (3) Board of Directors.

47.  Plaintiffs are informed and believe and on that basis contend Stoppenhagen clearly understood the Investing Entities' investment requirements having drafted the *Amended and Restated Articles of Incorporation* (the "AMENDED ARTICLES").  The AMENDED ARTICLES reflect Yonghua or any of its "Affiliates", as holders of any A-2 Preferred shares, are entitled to appoint one (1) of

the three (3) directors to Spartan's Board and "that, so long as the holders of Series A-2 Preferred Stock are entitled to elect a Series A Director, the affirmative vote of the Series A Director *shall be required* for the authorization of the Board of any of the matters set forth in Section 5.5 of the Investors' Rights Agreement".

48. Spartan filed the AMENDED ARTICLES with the Wyoming Secretary of State on or about September 8, 2020.  The Investors' Rights Agreement dated August 17, 2020, signed by Stoppenhagen also required *inter alia* the approval of the Series A Director before a "change the strategic direction or lines of business of the Company"; and before Spartan can "hire, fire, or change the compensation of the executive officers".

### (BAD FAITH CONDUCT AFTER THE SPA)

49. On or about August 2020, Wang was appointed as the "Series A Director" by Yonghua whereas Stoppenhagen was appointed as a Director by the Common Stock shareholders.  Stoppenhagen conferred with Wang by email as to the appointment of the third Director.  Dias was appointed as the third Director after Wang expressed to Stoppenhagen Dias's importance to Spartan and the joint venture.

50. Even after the close of the SPA Stoppenhagen continued to conduct Spartan's R&D and production activities of the *early stage projects* in violation of its ISO certification, QMS and/or QSR.  When Dias protested, Stoppenhagen removed Dias's administrative control from the cloud based servers and then required Spartan's engineering team to report directly to him and instead of Dias.

51. At Board meetings held in September and November 2020, Dias and Wang disagreed with Stoppenhagen on multiple action items.  Dias and Wang outvoted Stoppenhagen on several proposals including the allocation of resources between the *eCoil* System versus the *early stage projects* and whether the Spartan should lease a facility located in Southern California in addition to the Tustin Office. Stoppenhagen wanted to steer Spartan in a direction (i.e. away from focusing on the *eCoil* System).  Dias and Wang voted down the majority of Stoppenhagen's

proposals.

52. Plaintiffs are informed and believe and on that basis allege that these Board meetings confirmed for Stoppenhagen his initial fears.  Stoppenhagen perceived Dias as being more important to the Investing Entities than himself.

53.   In response and in or about December 2020, Stoppenhagen purportedly fired Dias as Spartan's CTO as retribution.  In an effort to commandeer control of Spartan for his personal gain, Stoppenhagen, thereafter, immediately also rekeyed Spartan's Fremont facility.

54. Stoppenhagen's purported termination of Dias violates the "SIXTH" Article of the AMENDED ARTICLES as well as Section 5.5 of the Investors' Rights Agreement that required the "Series A Director" (i.e. Wang) to affirmatively vote or consent to Dias's purported termination.  Wang never affirmatively voted for or consented to Dias's termination.

55. Stoppenhagen thereafter also attempted to replace Dias as Director with Gardner - a personal friend.  On May 24, 2021, Stoppenhagen unilaterally prepared and circulated a *Written Consent of Stockholders in Lieu of Meeting* (the "May 2021 Written Consent"), "being the majority of the stockholders. . . of Spartan Micro, Inc. . . . pursuant to the Corporation's Bylaws, hereby consent in lieu of a meeting" purporting to remove Dias as a Director of Spartan and appoint Gardner in his place.

56. Stoppenhagen did not have the authority nor the approval to take such action because Plaintiffs are informed and believe and on that basis allege herein there was a never a vote of any of Spartan's shareholders to remove Dias as a Director and appoint Gardner in his place.

57. Assuming *arguendo* that Spartan's shareholders did if fact vote, it is mathematically impossible for Stoppenhagen or otherwise to be able to appoint a Director to replace Dias as long as Yonghua or its affiliates possess any Series A-2 Preferred Stock.  The AMENDED ARTICLES provides that Stoppenhagen or anyone else could not have appointed a Director as long as Yonghua or its affiliates

possessed any Series A-2 Preferred Stock.

58. On June 18, 2021, Defendants improperly filed an Amended Annual Report with the Wyoming Secretary of State that fraudulently stated to the public that Dias was no longer a Director and had been replaced by Gardner.

## (STOPPENHAGEN'S BAD FAITH CONDUCT AFTER HIS TERMINATION BY SPARTAN'S DULY CONSTITUTED BOARD OF DIRECTORS)

59. After Dias was purportedly removed as a Director, Director Wang made several requests to Stoppenhagen to provide financial reports, resolutions, corporate records, and other documentation affecting the Investing Entities' interest as shareholders and relating to Spartan's operational activities.

60. Stoppenhagen steadfastly refused to provide any of the documents requested by Wang.

61. In response, the majority of the duly elected and serving Board of Directors, namely Wang and Dias, in compliance with Wyoming law, provided proper notice to Stoppenhagen of a special meeting of the Board of Directors on June 20, 2021. Pursuant to that notice, the Board meeting was scheduled and held on June 21, 2021, via Zoom.

62. During the June 21, 2021 Board Meeting, which Stoppenhagen refused to attend, Dias and Wang discussed and resolved *inter alia* that Dias and Wang, not Tom Gardner, are the proper Directors of Spartan and terminated Stoppenhagen as Spartan's CEO, President and Secretary and any other executive and officer positions held in the Corporation effective immediately.

63. Despite that termination, Stoppenhagen has refused to vacate Spartan's premises and has continued to attempt to operate Spartan and has refused to turn over assets of the Corporation to the Board.

64. Plaintiffs are informed and believe and on that basis allege that Stoppenhagen continues to draw a salary from Spartan. In the interim period between June 21, 2021, and the date of filing this complaint, Plaintiffs are informed and believe and

on that basis allege that Stoppenhagen's wrongfully-received compensation has cost the Corporation more than $75,000.00 in damages.

65. Plaintiffs are informed and believe and on that basis allege that on June 21, 2021, individuals under the direction of Stoppenhagen and Gardner, removed personal property belonging to Spartan from the facility in Costa Mesa which Dias and Wang did not authorize to be leased. On the same date, Stoppenhagen is believed to have absconded with testing equipment belonging to Spartan from the unauthorized Costa Mesa facility.

66. On October 5, 2021, Spartan under the purported and wrongful direction of Stoppenhagen and his invalidly comprised "Board" filed suit in the United States District Court for the Central District of California – Southern Division *Spartan Micro, Inc. v. Dias* (Case No. 8:21-CV-01630) against some the plaintiffs herein.

67. Such suit, though putatively brought on behalf of Spartan, was not authorized by the duly elected and serving Board of Directors of Spartan (i.e. Dias and Wang) or any validly employed and empowered director of the Corporation.

68. As a direct and proximate result of the Stoppenhagen's actions enumerated above, Plaintiffs have been advised by various supply-chain and third-party partners they refuse to work and conduct business with Spartan thereby undermining Spartan's ability to produce products for MedTech. The refusal to work with Spartan not only is injurious to Spartan but also to Plaintiffs.

69. Plaintiffs are informed and believe and on that basis allege that Gardner aided and abetted Stoppenhagen's bad acts. Instead of attempting to restrain Stoppenhagen, Gardner enabled and encouraged Stoppenhagen's egregious conduct to benefit himself and therefore is a partial cause of Plaintiffs' injuries.

**(SCIENTER)**

70. Stoppenhagen acted intentionally or with reckless disregard for whether the statements were true or false in the misrepresentations above and in any failure to disclose material facts he was under a duty to disclose or that were necessary to

make the other statements he had made, in light of the circumstances in which they were made, not misleading.  Further, Stoppenhagen's conduct constituted such extreme departure from standards of ordinary care, and was so obvious, that he must have been aware that he was misleading Plaintiffs.

## COUNT I

### SECURITIES FRAUD – RULE 10b-5

### (Against Stoppenhagen and DOES 1-5)

71. Investing Entities re-allege and incorporate by reference paragraphs 1-70 in their entirety and hereby incorporate them by reference as though fully set forth herein.

72. Stoppenhagen, directly or indirectly, in the course of communications with the Investing Entities, used the mails (paper as well as electronic) and telephone and/or means and instrumentalities of interstate commerce and transmission, including the federal banking system.

73. In such communications, Stoppenhagen, directly or indirectly, with scienter: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts and practices which operated or would operate as a fraud or deceit upon other persons.

74. Investing Entities relied on and were induced by Stoppenhagen's conduct to enter into the SPA.  The untrue statements and artifices damaged the Investing Entities in a total amount no less than $1,000,000.00.

75. On account of such acts, Stoppenhagen directly or indirectly violated 15 United States Code Section 78j(b) [Section 10(b) of the Securities Exchange Act of 1934] and Rule 10b-5 promulgated thereunder (17 Code of Federal Regulations Section 240.10b-5).

76. As a direct, actual and proximate consequence of Stoppenhagen's actions,

Investing Entities have sustained and will sustain damages of no less than $1,000,000.00 exclusive of interest, costs and consequential damages. The ultimate amount will be proven at trial.

## COUNT II

### BREACHES OF FIDUCIARY DUTY

### (Against Stoppenhagen and DOES 6 - 10)

77. Plaintiffs re-allege and incorporate by reference paragraphs 1-70 in their entirety and hereby incorporate them by reference as though fully set forth herein.

78. At all times pertinent hereto, Stoppenhagen owed duties of good faith and fair dealing in discharging his fiduciary duties owed to the Plaintiffs.

79. Defendant Stoppenhagen breached his duty of good faith and fair dealing owed to Plaintiffs by:

- Failing to provide the Plaintiffs with timely financial statements and reports of the Corporation when requested;

- Removing the Corporation's equipment, files and documents from its corporate offices without informing the Board or other personnel;

- Improperly attempting to terminate Dias as an Executive Officer of the Corporation without Board approval or consent;

- Changing the locks on the exterior doors of the Corporation's physical buildings to the exclusion of Plaintiffs;

- Improperly attempting to remove Mark Dias as a Director and appointing Thomas Gardner as a Director without the requisite shareholder approval;

- Disregarding directives and instructions of the Board of Directors;

- Actively attempting to gain functional control of the Corporation without valid Shareholder or Board approval;

- Instituting legal action on behalf of the Corporation against the other Directors without justification or authority;

- Taking actions which significantly increase the likelihood of third party claimants against the Corporation piercing the corporate veil;

- Converting Corporate assets, as described herein, including but not limited to wrongfully taking funds as pay and benefits despite his termination, converting physical assets, causing corporate assets to be expended to further his scheme of wrongful control; and

- Knowingly and intentionally violating the preferential rights of the Investing Entities as Series A-2 Preferred Stock Shareholders.

80. As a direct, actual and proximate consequence of Stoppenhagen's actions, Plaintiffs have sustained and will sustain damages of no less than $1,000,000.00 exclusive of interest, costs and consequential damages.  The ultimate amount will be proven at trial.

81. Furthermore, Stoppenhagen's improper conduct as alleged above, was oppressive, fraudulent, malicious and subjected Plaintiffs to undue hardship in a willful and conscious disregard to Plaintiffs' rights, warranting exemplary and punitive damages in accordance with *Civil Code* section 3294.

## COUNT III

### BREACH OF WRITTEN CONTRACTS

### (Against All Defendants and DOES 11 - 15)

82. Investing Entities re-allege and incorporate by reference paragraphs 1-70 in their entirety and hereby incorporate them by reference as though fully set forth herein.

83. Investing Entities and Defendants entered into contractual agreements that *inter alia* protected Plaintiffs ability to govern Spartan.

84. These written agreements include *inter alia* the SPA, the Investors' Rights Agreement and the Voting Agreement all three of which were dated August 17, 2020.

85. Investing Entities have fully performed and fully discharged their obligations

and duties for each of these agreements.

86. Investing Entities have repeatedly requested Defendants to recognize the written agreements in place by and among the parties.

87. Despite Investing Entities' requests, Defendants have repeatedly breached the agreements in place by and among the parties refusing to *inter alia* recognize Dias as a Director, refusing to make Spartan's financial records available to Investing Entities, and by refusing to make Spartan's facilities, bank accounts, equipment and other assets available for Investing Entities' use and/or benefit.

88. As a direct, actual and proximate consequence of Defendants' breaches of contract, Investing Entities have sustained and will sustain damages of no less than $1,000,000.00 exclusive of interest, costs and consequential damages. The ultimate amount will be proven at trial.

## COUNT IV

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against All Defendants and DOES 16 - 20)

89. Investing Entities re-allege and incorporate by reference paragraphs 1-70 and 82-88 in their entirety and hereby incorporate them by reference as though fully set forth herein.

90. Within the agreements between the Investing Entities and Defendants exist an implied covenant of good faith and fair dealing that no party will do anything to unfairly interfere with the right of any other party to receive the benefit(s) of the agreements agreed upon by the parties.

91. Investing Entities entered into these agreements trusting that Defendants would, in good faith, abide by the terms of each deal in good faith, and not do anything to deprive Investing Entities of the benefits agreed upon by the parties.

92. Defendants benefited from Investing Entities' actions.

93. As alleged above, Defendants breached their duty of good faith and fair

dealing thereby depriving the Investing Entities of the benefit(s) of the agreements agreed upon by the parties.

94. As a direct, actual and proximate consequence of Defendants' breaches of contract, Investing Entities have sustained and will sustain damages of no less than $1,000,000.00 exclusive of interest, costs and consequential damages. The ultimate amount will be proven at trial.

## COUNT V

### UNJUST ENRICHMENT

### (Against All Defendants and DOES 21-25)

95. Investing Entities re-allege and incorporate by reference paragraphs 1-70 in their entirety and hereby incorporate them by reference as though fully set forth herein.

96. Pursuant to the parties' agreements, Spartan has received and benefitted from the use of the no less than **$5,000,000.00** the Investing Entities have remitted to Spartan to date.

97. Defendants have usurped and/or converted those monies for their personal enjoyment, use, and benefit at the expense of not only the Corporation but also to Investing Entities' detriment.

98. Defendants would be unjustly enriched if they are permitted to retain these monies.

99. As a direct, actual and proximate consequence of Defendants' breaches of contract, Investing Entities have sustained and will sustain damages of no less than $1,000,000.00 exclusive of interest, costs and consequential damages. The ultimate amount will be proven at trial.

## COUNT VI

### DECLARATORY RELIEF

### (Against All Defendants and DOES 21-25)

100.     Plaintiffs re-allege and incorporate by reference paragraphs 1-70 in

their entirety and hereby incorporate them by reference as though fully set forth herein.

101.    Plaintiffs seek a declaration of their rights, duties, and obligations pursuant to the written contracts referenced herein.

102.    Plaintiffs also seek a declaration of the construction and/or validity of these written agreements.

103.    An actual controversy therefore exists as to these matters such that a judicial declaration of the parties' respective rights are required.

## COUNT VII

### FRAUD

### (By Dias Against Stoppenhagen and DOES 26-30)

104.    Dias re-alleges and incorporates by reference paragraphs 1-20 in their entirety and hereby incorporate them by reference as though fully set forth herein.

105.    Dias, in conjunction with Stoppenhagen, were the two original founders of Spartan.  They both became shareholders of the Corporation on or about March 31, 2016, with each receiving 3,500,000.00 share of Spartan's common stock.

106.    On or about April 1, 2017, Dias signed an employment agreement with Spartan which entitled him to $225,000.00 per year in salary, an annual bonus of $20,000.00, $400.00 per month for healthcare benefits, and $500.00 per month for a home office allowance.

107.    Spartan did not pay Dias the amounts set forth above in 2017, 2018 or 2019 because it lacked the funds.  Instead, Spartan paid Dias a total of $54,664.00 in 2017, a total of $78,700.00 in 2018, and $67,500.00 in 2019.

108.    As consideration to forego any immediate claims against Spartan and/or Stoppenhagen for unpaid wages or otherwise, Stoppenhagen, Spartan and Dias agreed that all monies due to him pursuant to this agreement would accrue as "accrued salary" and/or as deferred compensation until such time as Spartan attracted sufficient funding from investors (e.g. the Investing Entities) that it could

pay the monies due in full.

109.     On or about December, 2019 and after the Investing Entities began to communicate with Stoppenhagen about a possible investment in Spartan, Stoppenhagen fraudulently represented to Dias that the Investing Entities advised him that they would not do any deal to invest any monies in Spartan *unless* Dias agreed to reduce the amount of "accrued salary" by a minimum of $500,000.00.

110.     On or about December 2019, Stoppenhagen presented to Dias the EMPLOYMENT AGREEMENT AMENDMENT 1 (the "Dias Amendment").  Dias is informed and believes and on that basis alleges that Stoppenhagen drafted the Dias Amendment.  Stoppenhagen advised Dias that the Investing Entities demanded that Dias agree to and enter into this amendment revising his employment agreement with Spartan and expressly reduce the "accrued salary" by a $500,000.00 as a condition precedent and before they would agree to the SPA.

111.     In reliance on Stoppenhagen's misrepresentations, Dias executed the Dias Amendment on or about late December 2019 thereby waiving $500,000.00 in "accrued salary".

112.     Dias was justified in relying on Stoppenhagen's misrepresentations because prior to August 2020, he was unaware of Stoppenhagen's true dealings with the Investing Entities.

113.     Dias spoke to Wang by phone on or about November 2020 and as Stoppenhagen was threatening to terminate Dias as Spartan's CTO.  Dias asked Wang at this time why the Investing Entities needed Dias to waive his "accrued salary" by $500,000.00.  To Dias's shock and dismay, Wang advised that this was the first time he had heard of this.  Wang advised that although he was aware of Dias's agreement to forego $500,000.00 in deferred compensation, neither he or the Investing Entities ever demanded the same as a condition of the agreement to enter into the SPA.

114.     Dias thereafter confronted Stoppenhagen about this revelation.

Stoppenhagen denied Wang's claims and maintained the Investing Entities would not have entered in the SPA without Dias's agreement to the Dias Amendment.

115.     Dias is informed and believes and on that basis contends that Stoppenhagen always intended, and even before entry into the SPA, to commandeer control of Spartan, its assets and the funds the Investing Entities would and ultimately did invest in Spartan for his sole use and benefit.  By eliminating Dias's $500,000.00 in "accrued salary", Stoppenhagen therefore netted himself an additional $500,000.00 in cash that he intended to abscond with.

116.     Dias's reliance on Stoppenhagen's representations proximately caused Dias to sustain damages of no less than $500,000.00 exclusive of interest, costs, consequential and punitive damages.  The ultimate amount will be proven at trial.

117.     Stoppenhagen's improper conduct as alleged above, was oppressive, fraudulent, malicious and subjected Dias to undue hardship in a willful and conscious disregard to Dias's rights, warranting exemplary and punitive damages in accordance with *Civil Code* section 3294

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prey for judgment in their favor and against Defendants as follows:

118.     For damages in amount to be proven at trial, but exceeding $1,000,000.00 exclusive of interest;

119.     For incidental and consequential damages;

120.     For punitive damages;

121.     For declatory relief pursuant to *Code of Civil Procedure* section 1060;

122.     Prejudgment injunctive relief;

123.     An Order declaring that Stoppenhagen is no longer an officer of the Corporation; Stoppenhagen be removed from all corporate offices; terminates any and all relationships with the Corporation; Stoppenhagen be immediately removed as a signatory for banking activities of the Corporation; and that he immediately

vacates the premises of the Corporation; and Stoppenhagen be ordered to return any and all assets of the Corporation that he has or caused to be removed from the Corporation's offices;

124.     An Order declaring that Gardner is not a Director of the Corporation; Gardner be removed from all corporate offices; terminates any and all relationships with the Corporation; and that he immediately vacates the premises of the Corporation; and Gardner be ordered to return any and all assets of the Corporation that he has or caused to be removed from the Corporation's offices

125.     For prejudgment and post-judgment interest;

126.     For costs of suit;

127.     For attorneys' fees by operation of law, statute or contract; and

128.     For such additional remedies as this Court may deem just and appropriate under the circumstances.


Dated:  April 20, 2022                    RIMÔN, P.C.



                                          By: _____
                                              Ivan L. Tjoe
                                              Jonathan N. Rosen
                                              Attorneys for Plaintiffs

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:  April 20, 2022

RIMÔN, P.C.

By: _____

Ivan L. Tjoe
Jonathan N. Rosen
Attorneys for Plaintiffs

COMPLAINT